Oral argument not to exceed 15 minutes per side. Mr. Supervisory Attorney Charles Mark Pickerel with law student Andrew Marion Arguing. Good morning, Your Honor. My name is Mark Pickerel and may it please the court, I'm an adjunct professor at the Vanderbilt Appellate Litigation Clinic for the current year and the court has approved Mr. Andrew Marino under rule 4060 to present the argument on behalf of Mr. LaVictor. All right. Your Honor, may it please the court, Andrew Marino for appellant, Mr. Lynn LaVictor. I'd like to request three minutes for rebuttal. All right. I'd like to address two issues today with the court's permission. First, our challenge to the sufficiency of the evidence as to four of the seven counts of conviction and then I'd like to turn to the expert witness relied upon below and then conclude with a discussion of how these two things combine to render Mr. LaVictor's trial fundamentally unfair. I'll start with the sufficiency of the evidence challenge. We're challenging the sufficiency under Jackson v. Virginia of four of the seven counts, counts one, two, three, and six. Count one was a count of sexual abuse under 18 U.S.C. 2242-2B, which requires, as relevant here, a mens rea of knowingness and then a sexual act and then that sexual act has to take place while the victim is physically incapable of giving consent or declining to engage in the sexual act. The problem here is the United States really relies on just a snippet of testimony to support the judgment beyond a reasonable doubt. It relies on testimony of the victim who said that there was a moment that she cannot remember and that's all the United States is relying on. And if you look at their brief on page seven. And I'll remember with regard to what? You're right. She, so the night of the incident they engaged in sexual intercourse and there was a, she said, and this is really all the testimony there is, there is a moment I cannot remember and then I woke up. And the United States at page 72 of their brief says that's sufficient for the jury to reasonably infer that Mr. LaVictor took a substantial step towards engaging in a sexual act. Well, there's more evidence than that. She gave us a statement which she later tried to recant, but that was the statement was before the jury as well as the evidence from the hospital examination and surrounding context. So there was, there was more evidence than that. I would respectfully disagree, Judge Clay, and I would say the majority of her statement, which we don't think should have been allowed into evidence, but the majority of her statement would go to the other counts, aggravated sexual abuse or assault or habitual domestic offender. But this statute is very particular in what it requires, the sexual abuse statute. And it requires a sexual act while the victim is asleep or intoxicated. And the United States says she, she testified that she was briefly asleep. And so you can infer that Mr. LaVictor took a substantial step. We would submit under Jackson against Virginia and under Inouye Winship, that's, that's not a reasonable inference. That's mere speculation. I've kind of forgotten, counsel, was she asleep or was she out? Well, it's, it's a difference between sleeping and being passed out. Right. And it's not clear from the record. All she says is there's a moment she can't remember and then she woke up. And so you could say she was asleep. Well, you, you could be out for quite a while. And when you come to, it seems like only a moment. That's, that's my point. That's true, Judge Daughtry. But there's no evidence that anything happened during that time. And he would really have needed to engage. Well, how would she know if she was out? That's the problem. That is the problem, but Judge Daughtry, but I think it's a difficult statute to convict someone under. And that's why there's these other aggravated sexual abuse statutes. And I would submit that the, the evidence the United States really needs is if the victim woke up and Mr. LaVictor was about to engage in a sexual act, and that's a reasonable inference that he was going to engage in a sexual act while she was physically incapable of. However, the sexual act itself might, might have awoken her due to the violence of it or the physical contact or, or whatever. So, I mean, it's not, I'm not sure it's quite as simple as you're putting it. Well, I think, Judge Clay, that's something we can speculate about, but I don't think there's enough evidence on this circumstantial evidence from her, from the statement that she gave, that she later tried to recant, but which was presented to the jury and was part of the trial. And the evidence taken at the hospital as to injuries and so on. I mean, there, there's a lot of circumstantial evidence there. Right. But again, Judge Clay, I think that all goes to sexual acts occurring while she's conscious. And I just think as to count one, as to the incapacitated sexual abuse count, there's just, there's nothing tying a sexual act to her being physically incapable of declining. What's the upshot for, for your client? What's the effect on the sentence for this particular, if you were correct and the court agreed with you, what, what's the upshot? We would remand for a. On that particular, I'm, I'm really speaking about the sentence, obviously. I mean, the, the, say the other counts hold. What, does this affect the sentence in a significant way? It, it may. I mean, I would remand for. You don't have that as a part of your argument. That, that if you, if the court found this, then the sentence is reduced by. Right, well. I mean, what could it possibly be? We're, we're up to, is this close to a life sentence? Almost 30 years. 30. I, I don't know what the If I could go to count six, which is witness tampering, corrupt persuasion. And our submission is that there's not enough evidence on this record of the corruptness of the persuasion. We submit under Arthur Anderson against United States. Corruptly persuade really means doing something for a promise of benefit or a threat of harm. I mean, that just comes from the record. This is just a boyfriend drafting a mock affidavit for his girlfriend to sign. There's no implicit threat of harm. There's no explicit, hey, will you please lie for me? There's, there's no way that you could derive a mens rea of knowing this from the evidence that the United States is relying on. Hadn't he been ordered to stay away from the woman? He, I, I believe if I'm not incorrect, that that was after he, he drafted this mock affidavit. But I mean, it was intercepted by, it was intercepted by the United States before it got to her. And he pled guilty to count seven, which was violating the, I think the PPO or the restraining order at least. So he did plead guilty to that count. And if you look at the United States brief at page 76 and 77, they, they don't cite Arthur Anderson. And they really cite two cases that aren't applicable here if we're trying to tease out what corruptly persuade means. They cite United States against Jeter, which is a 1503 case. It's not a witness tampering statute. And the author, Arthur Anderson, in footnote nine said, 18 U.S.C. 1503 is, is really a different statute because it covers different conduct because it doesn't require knowingness of the corrupt persuasion. And so it's a different inquiry. And they also cite United States against Montgomery, which is an unpublished case from this circuit. And the, the difference between this and Montgomery and other 1512 cases that this court has issued is in Montgomery the defendant explicitly said, please go on the stand and lie for me. Say something that didn't happen. You know, testify as to something that wasn't true. And so you can clearly get from that a mens rea of knowingness as to the corrupt persuasion. And there's, there's nothing like that in the record here. And so our interpretation of corruptly persuade I, I think harmonizes with United States against Eaton, which was a 2015 case from this circuit. What if the affidavit is false? Well, if the affidavit is false under our reading of 1512, Judge Daughtry, there's still no threat of harm or no promise of benefit that would render it corrupt persuasion. I think it's just persuasion. Yeah, but isn't that subordination of perjury statute superfluous? It's 18 U.S.C. 1622. I think the statute has to be read as covering less conduct, especially since the subordination of perjury statute carries a sentence of five years and this statute carries a sentence of up to 20 years, I think. So I think it's clear that Congress was trying to cover less conduct with this. If I could turn to the expert witness that was relied on below, Dr. Bonomi, we raised 702 challenges and 403 challenges mostly. Dr. Bonomi was admitted for a pretty narrow purpose and the purpose was to explain the phenomenon of domestic violence witness recantation. And her testimony went far beyond that. And so there were really three problems with it. Much of it was irrelevant. Much of it was unduly prejudicial. And then much of it essentially constituted character evidence. And so the irrelevance and the overly prejudicialness was really, she listed multiple anecdotes from domestic violence perpetrators whom she had interviewed in her research who had no connection to this case. She testified about quotations by them in that just are too prejudicial. So a couple of them are she testified at page 2157 of a man who drove his car off the road while his girlfriend and their son were in the car, of a man who attempted to suffocate his girlfriend 13 times, that's page 2170 of the record, a man who bit a chunk out of his girlfriend's face and then suffocated her in front of their one-year-old child. She testified to that anecdote twice. What was this offered for? Was it offered to say that these women then later recanted? No, it wasn't. I honestly don't know what it was offered for, Judge Daughtry. It was sort of to lay a base for her knowledge of domestic violence, I suppose, but it doesn't have any relevance to this case. And it really has a high, I mean, just saying those examples, it has a high likelihood of inflaming the jury. Well, I guess so, except that the jury knew none of that happened in this case. That's true, Judge Daughtry. And I assume that you all, not you all, but whoever was representing Mr. LeVictor cross-examined her about all this. That's true. True, but I think, Judge Daughtry, when a certified expert sort of lumps in the defendant with these pretty caustic, toxic examples of prior domestic violence, I don't think it has no effect on the jury, and I certainly think, combined with the other statements that Dr. Bonomi made, I mean, for example, she stated unequivocally, quote, We know that our recanting victim signifies an especially dangerous offender, one who is going to repeat severe abuse against the victim over time and coerce her. That's 2158 of the record. That's an unequivocal statement saying it's guaranteed that because the victim in this case recanted, Mr. LeVictor will commit crimes again, and I don't think that's a permissible statement, and combined with the other anecdotes, I think the expert witness should have been excluded. Just on the argument for the use of the witness that the jurors don't have expertise or background necessarily to understand the phenomenon of recantation in the context of domestic violence, the expert witness was testifying to explain how domestic violence and the phenomenon of recantation intermesh or work together. Right, and I don't, I mean, I'm not conceding, Judge Clay, that that would be a permissible thing under 702, under Daubert, but her testimony, if that was proper, went far beyond that with these anecdotes and these quotations and these unequivocal statements about Mr. LeVictor's propensity to reoffend, and so I think it was too wide-ranging. She didn't testify about his propensity to reoffend because she admitted that she hadn't met or examined or spoken to him. Well, true, but she said she was there to testify as to the victim's recantation, and she said unequivocally when a victim recants, it is guaranteed that a domestic abuser will offend again, and so I think as night follows day, she was testifying that Mr. LeVictor, even if she hadn't examined him, would reoffend. If there are no other questions. Thank you. Good morning. May it please the Court. I'm Jeff Davis. I represent the United States. I represented the United States in trial with co-counsel, Ms. Hannah Bowlby. Addressing the appellant's first argument regarding the sexual act, count one of the charge. First of all, addressing your question, Judge Cook, if the court were to hold that that in charge was not valid, we would still have the other two sexual assaults. Count one, count two, and count three. I'm looking to say what benefit, if counsel's correct, what benefit lies in that? In ruling that that charge doesn't hold. Correct. Those three counts, count one, two, and three, the sexual assault charges, those were the 355-month sentences. Right. That gets him to the max anyway, or I take it. Right. Maximum sentence, right. Correct, Your Honor. And as for the argument that we didn't show that the victim was physically incapable of declining participation, what we charged in count one was an attempt. It wasn't the completed sexual act because counts two and count three are the completed sexual acts. What this victim. . . The argument is the evidence was extremely thin to support that. Well, there's case law that's cited in our brief, Fast Horse is one of them, that holds that if a victim is asleep and the sexual assault is perpetrated on them, that's sufficient to meet this statute that they're physically incapable of declining participation. In this case, the victim stated in her grand jury testimony that she could not remember what happened after midnight, but she wakes up and her clothes are off, and then it gets into the violent sexual assault right after that. She also told that to Officer Menard, who testified to that at trial. And again, it's the attempt that we charged in that case, in that count. Count six, witnessing, tampering, again, we charged an attempt. We didn't charge the completion of the witnessing, tampering. And Judge Clay, I think you had a question as to when the defendant was ordered not to have any contact. We do a lot of, sadly, we do a lot of these cases from Indian country with domestic violence, sexual assault, especially with domestic violence. At the initial appearance, we asked the magistrate to order that there be no contact in any manner with the victim in the case, including electronic, phone, anything like that. And Judge Greeley ordered that in this case before the August 5th letter, the affidavit that he attempted to send out. And the affidavit on its face says, tell the court, rewrite this in your own handwriting. It's an affidavit that says it was rough, consensual sex. And again, we charged attempt. We did not charge the completed act in that case. Getting to the defendant's argument regarding the expert witness. First of all, we presented the expert witness for the purpose of offering to assist the jury in understanding and evaluating the seemingly inconsistent actions of the victim. Her initial refusal to make a law enforcement report, returning to the defendant shortly after the assault, him driving her to the grand jury, and her driving him to self-report. And when he was arrested, there was an arrest warrant. She drove him to Marquette. So no one could truly quarrel with how probative this would be for a jury unfamiliar with the syndrome. Right, and we cite three cases, one from the Seventh Circuit. But the argument is about the – and it's always prejudicial in some regard. Correct. But the test is whether it's unfairly prejudicial. Correct. And counsel gives us the litany of egregious kind of conduct that he argues was inflammatory. Right. But when you look at the context of the trial, Dr. Bonomi testified to that on direct. And on cross-examination, as Judge Dougherty asked, was the expert cross-examined? She was. She fully cross-examined. They went through the power and control wheel, and they asked hypotheticals. Well, if this person lives in Canada, which our victim was, that factor wouldn't apply. If they didn't have children in common, one of the other factors wouldn't apply. So she went through that with the expert, and she also talked about lack of much physical violence between the couple. Quite frankly, our victim started to recant shortly after we indicted the case, even before we indicted the case. But anyways, we did have a foundation for that. I mean, she told the FBI in July, July 1st or 2nd, before she renewed her relationship with the defendant, that there was an incident about four months in March of 2014 where he punched her in the face and choked her to unconsciousness at the Bay Mills Casino. She had told the FBI agent that before she recanted. We also had statements from medical personnel and others where she said that she was afraid of him, that she was in an aggressively abusive relationship. But more importantly, as to Dr. Bonamy's testimony, the defense asked her, did you meet with the victim in this case? She said, no, I didn't meet with him. Did you review reports? No, I'm not making a credibility determination in this case. Now, finally, Judge Edgar, when he was reviewing the Rule 29 and Rule 33 motions, pointed out that they made similar arguments before him. And he said, a lot of these issues, when an expert witness, once they're qualified and testifies about factors, the appropriate way to address those is through cross-examination. And he said, quite frankly, the defense did a good job on that in this case. All of those toxic examples, he pointed out, they really were not applicable in this case. And then I think most critical here is his instruction to the jury, because we had a number of expert witnesses. But he instructed the jury that, like any other witness, you can take some of what the expert said, all of what the expert said, or you don't have to take any of it. So, you know, I disagree that these toxic statements resulted in somehow injustice to the defendant, or any of the other evidence that they argue did such in this case. I really think, in trying this case, I think what happened is the jury had to determine credibility in this case. And, you know, sexual assault, domestic violence, they never happen out in public. So it becomes a he said, she said. And the perpetrator and the victim statements. And in this case, we had a clear recantation. And they had to weigh this victim's statements. And when she was called by the defendant on the last day of trial, she took the stand. And what she did initially, she went through Dr. Bonamy's testimony on the power and control wheel, and said, this doesn't apply, this doesn't apply, I'm a Canadian citizen, I don't have children with him, he doesn't have any economic control over me. And then she said it was rough, consensual sex. But some of the things that I think, you know, stood out in her testimony was, she said at one point that she stayed in the hospital. She was asked, how come you stayed in the hospital four days? Because I like the food. That was her response. They asked her why she went to the domestic violence shelter right after that. Convenience for the kids, they wanted to watch the Fourth of July proceedings. And then she said at one point that once she got out, she tried to make contact with the defendant. And they asked, well, why did you try to make contact? Because I wanted to meet with him. He met me at the park, and I had sex with him. I had sex in the car, on the car, in the grass in broad daylight. And they asked, well, why did you do that? Because I didn't know if I even had stitches. Nobody told me I did. And she forgot she had written a letter to him prior to that, indicating that she was laying there, she didn't know why she was with him, and that she had stitches in her cervix. So I think what it boils down to is credibility in this case. If the Court has no further questions. Apparently not. Thank you. May it please the Court? Just a few quick points on rebuttal. The United States notes a couple of times that they're only charging on attempt for a few of these counts. But charging Mr. LeVictor with attempt doesn't lessen the evidentiary burden. They still have to prove beyond a reasonable doubt. And we submit they haven't done that as to counts 1, 2, 3, and 6. And as to your question, Judge Cook, if this Court were to find that there were insufficient evidence as to those counts, we think the sentence would probably be about 15 years, I think, on remand. So a little less than five years for each count. I'd also like to note that it's much easier for a jury to make these sorts of credibility determinations if they have an expert witness who has lumped the defendant in with multiple toxic but irrelevant perpetrators and who has unequivocally stated that he has a likelihood, a near guarantee, to reoffend again. And so especially when the evidence is so close and it really may come down to a credibility determination, the expert witness could have a serious prejudicial effect. And I'd like to point out that as to count 1, when the victim testified that there was a moment she didn't remember and then she woke up naked, there's not even testimony there that she fell asleep clothed. So there's no evidence that Mr. Levickter was the one who took her clothes off. So it's not a reasonable inference that he was the one who took her clothes off. It's just speculation. It's equally likely that she went to bed naked or that she took her own clothes off and doesn't remember that. And so for the purpose of count 1, there's really just a tiny hook on which the United States has latched the beyond a reasonable doubt determination onto and there's just not enough there, if there are no further questions. Thank you. And the case is submitted. Mr. Marion, you did a very, very good job for your client on your first time out. Thank you very much, and you may call the next case.